*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-1118**

State of Minnesota,
Respondent,

vs.

Kenneth Bernard Lax,
Appellant.

**Filed April 22, 2024
Affirmed
Bratvold, Judge**

Ramsey County District Court
File No. 62-CR-22-2682

Keith Ellison, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Zorislav R. Leyderman, The Law Office of Zorislav R. Leyderman, Minneapolis, Minnesota; and

Joseph G. Vaccaro, The Law Office of Joseph G. Vaccaro, PLLC, St. Paul, Minnesota (for appellant)

        Considered and decided by Connolly, Presiding Judge; Smith, Tracy M., Judge; and

Bratvold, Judge.

## NONPRECEDENTIAL OPINION

**BRATVOLD**, Judge

Appellant hit the victim once, causing the victim to fall and sustain a catastrophic brain injury. In this appeal from the sentence imposed for his conviction for first-degree assault, appellant argues that the district court erred in denying his motion for a downward dispositional departure. Because the district court did not abuse its discretion by denying appellant's motion and imposing a presumptive disposition under the Minnesota Sentencing Guidelines, we affirm.

## FACTS

Respondent State of Minnesota charged appellant Kenneth Bernard Lax with first-degree assault under Minn. Stat. § 609.221, subd.1 (2020). The complaint alleged that, on May 12, 2022, Lax punched J.G. in the face once; J.G. then fell to the ground, hit his head, and was found bleeding and unconscious. A bystander called 911, and St. Paul law enforcement responded. J.G. received emergency medical treatment, suffered "significant brain swelling," "was in critical condition," and required surgery. Information submitted to the district court disclosed that, as a result of his injury, J.G. requires a wheelchair, experiences repeated seizures, and struggles to communicate.

Lax pleaded guilty on December 8, 2022, and submitted a written plea petition with no agreement on a recommended sentence. Lax moved for a downward dispositional departure, requesting that the district court "depart from the Sentencing Guidelines, stay the imposition or execution of his sentence, and sentence him to a period of probation." In

the alternative, Lax asked for "a durational departure with a reduced period of incarceration."

In support of his motion, Lax filed a memorandum, an alternative presentence-investigation report prepared by a dispositional advisor, a forensic mental-health assessment prepared by a licensed psychologist, and a letter from Minnesota Adult and Teen Challenge's outpatient counseling center. The district court also received a presentence-investigation report (PSI) from the county, which recommended a prison sentence of 110 months. The PSI explained that the guidelines yielded a sentence range of 94 to 132 months in prison based on Lax's criminal-history score of two and the severity level of his offense—nine. The state also filed two victim-impact statements from members of J.G.'s family. For example, a letter from J.G.'s mother described the changes in J.G.'s life, including his seizures.

At the sentencing hearing, Lax's attorney argued that three mitigating factors supported Lax's request for a dispositional departure. First, the attorney contended that Lax had a "[p]hysical or mental impairment which caused [a] lack [of] substantial capacity for judgment when the offense was committed." Lax's attorney cited the forensic assessment, which explained Lax's experience as a victim of child abuse and witness to his mother being assaulted. The assessment stated that Lax was "triggered" by what he saw before he assaulted J.G.

Second, Lax's attorney argued that "other substantial grounds," such as the circumstances of the assault, lessened Lax's culpability. Lax's attorney pointed out that, just before the assault, Lax "believed that [J.G.] had assaulted [a] female and he saw her

3

fall to the ground." Lax then "punched him once." While Lax "initially did leave the scene," he returned, "gave a statement" to police, and "confessed to what he did." Lax's attorney also argued that J.G.'s brain damage was not caused by "the force of the punch" but by J.G. falling and hitting his head on the curb.

Third, Lax's attorney argued that Lax "is particularly amenable to probation." Lax's attorney contended that Lax has been steadily employed, has family support, and has had no criminal history for over ten years. Lax also followed the conditions of his release before sentencing. Three character witnesses spoke on Lax's behalf—his mother, his employer, and a community activist who had worked with him.

The prosecuting attorney asked that the district court impose a presumptive sentence of 110 months in prison because, while Lax "appears to be fully accountable and . . . remorseful for what happened, it doesn't change that fact that . . . it was his punch that was the mechanism of the injury that was so severe that [J.G.] has to suffer." The prosecuting attorney argued that, while Lax's childhood trauma "may have created certain triggers," that is not grounds for departure when J.G. was not the aggressor in an assault against Lax. The prosecuting attorney read a letter from J.G.'s mother describing the effect of J.G.'s injury on him and the family. Additionally, the prosecuting attorney played a video of a victim-impact statement from J.G. himself.

Lax also addressed the district court, saying he was "sorry that this whole thing happened," was "truly sorry for the injuries that [J.G.] sustained," and had "done things to make sure that [he] won't make another mistake like [he] did that night."

4

At the end of the hearing, the district court imposed a sentence of 75 months in prison, granting Lax's request for a downward durational departure after finding that the "conduct in this case was less serious than the typical [first-degree] assault" and that this was a mitigating factor. But the district court denied Lax's motion for a dispositional departure, explaining that it was persuaded by "the seriousness of the crime committed" and "how it fits contextually into [Lax's] criminal history . . . so [it] cannot in good faith make the finding that [he is] amenable to probation." Accordingly, the district court could not "come to the conclusion that [Lax was] a good candidate for supervision in this case on probation."

Lax appeals.

## DECISION

The Minnesota Sentencing Guidelines establish a range of presumptive sentences for felony convictions depending on the seriousness of the offense and the defendant's criminal history. Minn. Sent'g Guidelines 1.A. (Supp. 2021). The legislature's stated purpose for the guidelines is to "maintain uniformity, proportionality, rationality, and predictability in sentencing." Minn. Stat. § 244.09, subd. 5(2) (2020). Accordingly, deviations from the guidelines are uncommon and discouraged. *State v. Solberg*, 882 N.W.2d 618, 623 (Minn. 2016). District courts must impose a sentence within the guidelines range unless there are "identifiable, substantial, and compelling circumstances to support a departure." Minn. Sent'g Guidelines 2.D.1 (Supp. 2021).

The guidelines recognize both durational and dispositional departures from the presumptive sentence range. *Id.* A district court grants a downward durational departure

when it imposes a shorter sentence than that recommended in the guidelines. *See Deegan v. State*, 711 N.W.2d 89, 92 (Minn. 2006) (stating that a 360-month prison sentence was a "downward durational departure" from the presumptive 386-month prison sentence). A district court grants a downward dispositional departure when it stays the execution of a prison term and places a defendant on probation and under supervision. *See State v. Trog*, 323 N.W.2d 28, 30-31 (Minn. 1982) (stating that probation is a dispositional departure when the guidelines recommend an executed sentence). Typically, durational departures are based on the "seriousness of the offense," while dispositional departures are based on "characteristics of the defendant." *Solberg*, 882 N.W.2d at 623-24. A district court can, however, consider some offense-related factors when determining whether to grant a dispositional departure. *See State v. Stempfley*, 900 N.W.2d 412, 416, 419 (Minn. 2017) (affirming a district court decision granting a dispositional departure based on the defendant's minor role in the crime).

A defendant's amenability to probation is usually determined by mitigating factors such as "the defendant's age, [their] prior record, [their] remorse, [their] cooperation, [their] attitude while in court, and the support of friends and/or family." *Trog*, 323 N.W.2d at 31. Mitigating factors can justify a downward departure, but even if mitigating circumstances are present, a district court may decline to depart from the guidelines. *State v. Pegel*, 795 N.W.2d 251, 253-54 (Minn. App. 2011).

Appellate courts review a district court's decision to grant or deny a motion "to depart from the presumptive guidelines sentence for an abuse of discretion." *Solberg*, 882 N.W.2d at 623. Appellate courts generally "affirm the imposition of a presumptive

6

guidelines sentence when the record shows that the sentencing court carefully evaluated all the testimony and information presented before making a determination." *State v. Johnson*, 831 N.W.2d 917, 925 (Minn. App. 2013) (quotation omitted), *rev. denied* (Minn. Sept. 17, 2023). We will only reverse a district court's refusal to deviate from the guidelines in "rare" cases. *Id.* (quotation omitted); *State v. Kindem*, 313 N.W.2d 6, 7 (Minn. 1981).

Under the guidelines, the presumptive sentence range for first-degree assault is 94 to 132 months in prison for a defendant with a criminal-history score of two. Here, Lax pleaded guilty to first-degree assault; the district court imposed a sentence of 75 months in prison and therefore granted Lax's motion for a downward *durational* departure. Lax argues, however, that the district court abused its discretion by denying his request for a downward *dispositional* departure—in other words, by not staying his prison sentence and placing him on probation. At the sentencing hearing and in his district court motion, Lax asserted three mitigating factors that he reasserts on appeal.

In his brief to this court, Lax makes many specific arguments about the three mitigating factors discussed during his sentencing hearing. Some arguments emphasize the offense characteristics, including the circumstances of the assault—for example, Lax's belief that he saw J.G. assault a woman and Lax's evidence that he "was triggered into engaging and punching [J.G] due to external factors outside [of] his control" because he was a victim of child abuse and domestic violence. Some of Lax's arguments rest on his own character, such as his cooperation since his arrest as well as his accountability and remorse for the offense. He contends that he is "particularly amenable to probation." Lax also criticizes the PSI, arguing that it offers no analysis of the factors "weighing in favor

of departure as outlined" in his sentencing submissions. Finally, Lax argues that district court gave "unduly excessive weight to [his] old and decayed criminal offenses and improperly disregarded the fact that [Lax] was able to turn his life around and had remained law-abiding for over 10 years since his last felony offense dating back to 2008."

At Lax's sentencing hearing, the district court said that it reviewed "all the documentation" that Lax "submitted in support of [his] request for a departure." The district court acknowledged that Lax had undergone treatment, was remorseful, and did not intend for J.G.'s injury to be so severe. The district court also found that mitigating factors were present and supported a durational departure. But the district court could not "come to the conclusion that [Lax was] a good candidate for supervision in this case on probation." The district court cited the "catastrophic" and "extraordinary consequences for the victim" and Lax's criminal history. While significant time had passed since many of Lax's prior criminal convictions, the district court remained concerned with Lax's "pattern of criminal conduct" and, specifically, that he had violated probation before. Accordingly, the district court stated that it could not find that Lax was particularly amenable to probation and denied his request for a dispositional departure.

A district court need not grant a departure, even if mitigating circumstances are present. *Pegel*, 795 N.W.2d at 253-54. While the district court did not make specific findings about *every* mitigating factor that Lax raised, that does not affect our analysis. A district court "is not required to state its reasons for not departing on the record." *Johnson*, 831 N.W.2d at 926. So, without more, the district court's failure to comment on each mitigating factor is not an abuse of discretion.

8

The district court described its sentencing decision as "extraordinarily difficult." The district court also explicitly discussed many of the mitigating factors Lax advocated as well as analyzed Lax's amenability to probation. The record also shows that the district court reviewed all the information presented and determined that Lax was not a good candidate for probation. The district court acknowledged that Lax was not a "bad person" and had "a lot of good left in [his] life and a lot of good left in the community." Indeed, the district court granted Lax's motion for a downward durational departure after determining that Lax's conduct was less severe than is typical for first-degree assault. Still, the district court denied Lax's motion for a dispositional departure to probation, citing first the "seriousness of the crime," which it had described as "an act of violent aggression." Second, the district court pointed to how the assault "fits contextually" into Lax's criminal history. The district court was not required to make any findings while imposing a guidelines disposition, but its doing so indicates that it made a careful and reasoned decision.

We acknowledge the effect of this sentence on Lax and his loved ones. We conclude, however, that this is not a "rare" case in which we would determine that the district court abused its discretion by denying a departure motion. *Id.* at 925 (quotation omitted). In sum, we conclude that the district court acted well within its broad discretion by denying Lax's motion for a dispositional departure and imposing an executed sentence as presumed by the guidelines.

**Affirmed.**

9